UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| | | |
|---|---|---|
| Megan Maria Agard, | ) | |
| Chico Baker, | ) | |
| Robert DeSersa, | ) | |
| Kara Jane Logg, | ) | Civ. ___20-cv-1018 |
| Deborah Looking Back, | ) | |
| Prairie Rose White Buffalo, and | ) | |
| Phillip Louis Young Hawk, | ) | |
| | ) | |
| as named plaintiffs on behalf of a class, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Walworth County, South Dakota, and | ) | |
| Walworth County Commissioners | ) | |
| James Houck, Kevin Holgard, | ) | |
| Scott Schilling, Marion Schlomer, and | ) | |
| Davis Martin, all sued in their official | ) | |
| and individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

*"It doesn't take a rocket scientist to go to the jail and see that it needs to be replaced."*

Walworth County Sheriff Duane Mohr, at the April 22, 2014, meeting of Walworth County Commissioners

## Introduction

1.      This is a class action that seeks a permanent injunction prohibiting the defendants from violating the constitutional rights of people held in the Walworth County Jail ("the jail") for any reason other than conviction of a criminal offense. Defendants repeatedly have been told, by their own experts, in great detail, why the jail, built in 1909, is outdated, grossly inadequate, and dangerous.

2.      One of defendants' experts, an employee of the National Institute of Corrections, which is part of the United States Department of Justice, who has 25 years' experience in evaluating prisons, told them "I've never seen anything like it, to be honest with you.   It's—it's beyond anything you can do structurally-wise or remodeling."

3.      In 2018, defendants passed an official resolution recognizing that "the need for a new county jail has arisen in Walworth County, South Dakota."

4.      In a 2018 brochure attempting to convince the public of the need for a new jail, the Walworth County Jail Committee, consisting of two of the five county commissioners and the Walworth County Sheriff, posed and answered the question "Why do we need a new jail?"  Their answer was: it "is no longer a safe option for the community, staff or inmates.   Unless replaced, there is an overwhelming

2

amount of liability that may cost the county taxpayers millions of dollars due to potential lawsuits."

5.      Defendants, on the advice of their State's Attorney, chose not to notify their insurer of the condition of the jail, so that insurer would not cancel their insurance for it.

6.      Defendants operate the jail as a de facto "regional jail," and have entered multiple contracts to house prisoners from surrounding counties and the federal government.

## Parties

7.      Named plaintiffs are people held at the jail at the time this lawsuit is filed for any reason other than conviction of a criminal offense, and sue on their own behalf and on behalf of a class.

8.      Defendants are Walworth County, South Dakota, and the Walworth County Commissioners, who are sued in their official and individual capacities.

9.      Defendants operate the jail in violation of the United States Constitution, and will continue to do so unless restrained.

10.     Defendant county commissioners are the official policymakers with respect to all matters involving the jail.

11.     Defendants have chosen to allow the jail to continue to operate, despite being told by their own experts that it does not meet minimum constitutional standards.

## Jurisdiction

12.     This action is brought pursuant to 42 U.S.C. § 1983.  The Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3), and may grant relief under these laws, and under 28 U.S.C. §§ 2201-02.

## Class Action Pursuant to F.R.Civ.P. 23(a), (b)(1), and (b)(2)

13.     Named plaintiffs represent a class of people held in the jail, or who will be held in the jail before this lawsuit is concluded, including juveniles, for any reason other than having been convicted of a criminal offense.

14.     Named plaintiffs bring this action on behalf of that class.

15.     The class members are suffering direct and current injury as a result of defendants' actions and inactions, and will continue to suffer injury until the unconstitutional conditions of their confinement no longer exist.

16.     The class is so numerous that joinder of all members is impracticable.

17.     There are questions of law and fact common to the class.

4

18.    The claims of the representative parties are typical of the claims of the class.

19.    The named plaintiffs will fairly and adequately protect the interests of the class.

20.    Prosecuting separate actions by individual members of the class would create a risk of: (a) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for defendants; and (b) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

21.    Defendants have acted and refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole.

22.    The questions of law and fact common to members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## Facts

23.    Everything set forth above is incorporated herein by this reference.

24.    On August 6, 2013, the Walworth County Commissioners met with their invited expert guest, Jim Rowenhorst.

25.    Rowenhorst is a Correctional Consultant who has participated in more than 150 projects in 42 states involving correctional facility planning, transitioning from outdated to new facilities, and correctional staff training. He is a National Institute of Corrections consultant and has presented the National Institute of Corrections' Jail and Justice System Assessment, Planning of New Institutions , and How to Open a New Institution in more than 85 jurisdictions in 30 states. https://www.linkedin.com/in/jamesarowenhorst (last visited August 22, 2020).

26.    Rowenhorst told the commissioners that "we do not have enough bed space.  He also says the current jail is not secure.  He feels we should have a secure control room and he also feels that we are currently understaffed."   (Unless otherwise stated, this and all quotations below are from the official minutes of the Walworth County Commission.)

27.    Rowenhorst provided the commissioners with a document titled "Walworth County Jail Project," sub-titled "A review of the issues surrounding a

6

new jail facility." In it, he advised the commissioners: "federal case law concerning jail facilities and operations makes it very clear that the lack of funds is not a defense for poor facilities and inadequate staff. Those small counties that choose to operate a jail and ignore minimum requirements do so at their own risk." Hompe 941 (a document disclosed in a personal injury lawsuit).

28.    On January 7, 2014, the Fire Chief in Selby, where the Walworth County Jail is located, "came to the [Commissioners] meeting to make the board aware of the fire hazards at the jail. He stated that the Selby Fire Department is putting the Commissioners on notice that they will not be held liable for any problems concerning usability and accessibility of the fire escapes."

29.    On April 22, 2014, Walworth County's Sheriff Mohr told the Commissioners "It doesn't take a rocket scientist to go to the jail and see that it needs to be replaced."

30.    On March 10, 2015, Sheriff Mohr told the Commissioners "that there are problems with a remodel. He pointed out that in one cell there is a 10 inch drop in the floor from one side of the room to the other. He believes you could figure on a 2.5 million dollar remodel and still have an old building."

31.     On August 18, 2015, the Commissioners "received a report from Solien & Larson Engineering, P.C. on their findings of the structural inspection they conducted at the jail. In conclusion they stated that the 1909 jail is in poor structural condition, lack of maintenance and timely upgrade could be part of the issue. They do not believe it is feasible to renovate the structure."

32.     On October 6, 2015, Rowenhorst and Dean Marske, AIA, the President and Principal Architect of HKG Architects, Inc., of Aberdeen, "met with the board regarding the jail. Rowenhorst stated that the board needs to make a decision and become unified for the plan to work. He asked the board what they would like to do. He stated doing nothing is not an option. There was discussion on the possibility of building in Mobridge, closing the jail, a courthouse/jail project, regional jail or something for our own needs. He stated that true regional jails are hard to find and this jail is regional by default."

33.     On January 17, 2017, Commissioner James Houck stated "this building over here [the jail] is falling apart and we need to do something about it right now." https://www.youtube.com/watch?v=umiSxgacG0g at 39:05 (last visited August 27, 2020).

34.     On February 7, 2017, Marske "and Matt Beaner with Kyburz-Carlson Construction were in attendance to present preliminary plans for a proposed new Walworth County Jail facility and discuss the steps necessary to move the project forward."

35.     On April 4, 2017, "Rowenhorst met with the board to discuss options for an updated feasibility study. He stated at this point the county's options are to close and transport our inmates or to build a new facility of about 1500 square feet to accommodate."

36.     On June 7, 2017, Brad Hompe, MPA, of the National Institute of Corrections, met with the Commissioners to report on his assessment of the jail.

37.     The National Institute of Corrections is an agency within the Federal Bureau of Prisons that is headed by a Director appointed by the U.S. Attorney General.  https://www.bop.gov/about/agency/org_nic.jsp (last visited August 22, 2020). The Federal Bureau of Prisons is a federal law enforcement agency under the United States Department of Justice.

38.     At the June 7 meeting, according to the official minutes, Hompe told the Commissioners "that he was shocked with the condition of the facility and working condition of employees.  He stated that the 'facility was very outdated and

could no longer support your needs.' Hompe stated that there were many opportunities for potentially dangerous situations to take place because of the lack of resources, employees, and lack of constructive recreational programs for inmates. Hompe mentioned that the control center is supposed to be the safe hub of the jail and needs to remain closed and locked at all times. He mentioned that the jail did have[1] a good security system. He summarized all of his report by saying that he recommends that we pursue the option to purchase a new jail, further develop policies including commercial food preparation, sanitary improvements, correctional training and inspections."

---

[1]The words "did have" are a typographical error. Hompe's written report, discussed in paragraph 40 below, makes it clear that words should be "did *not* have." The report is highly critical of jail security. It states: "Routing visitors directly into the booking area, which is part of the secure jail, poses numerous safety and security concerns." Page 4. "[D]oor access modifications have been made to supplement for the lack of staffing," which "poses a significant security and safety issue[.]" Page 5. "The booking area lacks any cell to secure inmate in[.]" Page 5. "The control center is not a secure post as the door cannot be secured." Page 6. "When escorting inmates to and from these [high-risk] cells staff must pass in front of a group of inmates in the dorm area creating a vulnerable situation. This also creates a potential scenario for inmates to set up staff for an assault or hostage situation." Page 7.

39.    The video of the meeting shows that Hompe's actual remarks were more pointed than the minutes convey.  https://www.youtube.com/watch?v =U31imSzd07I (last visited August 27, 2020).

    a.    Starting at 2:32 of the video, he says: "I have to be very brutally honest with you, I am *shocked* [Hompe strongly emphasizes the word "shocked"] to say the least about the condition of the facility and more so the working conditions of the employees."

    b.    "There is absolutely no question in my mind that you have to do something.  That facility can no longer support your needs.  Your liability is through the roof.  I cannot *believe* [Hompe emphasizes on the word "believe"] that you haven't had significant litigation already.  It's actually horrible for your staff."

    c.    "I've never seen anything like it, to be honest with you.  It's—it's beyond anything you can do structurally-wise or remodeling."

    d.    At approximately 27:22 of the video, Hompe says "Anybody that's in the middle of a fire, they're not going to be able to last long in there."

11

e.  At approximately 34:30 of the video, Hompe says: "you've been made aware as a board and I think you've got some county and personal liability at this point if you don't do something, that could be considered deliberately indifferent."

f.  He adds: "You've been made aware of the situation and the report will document very thoroughly the investigation.  And you know there are unsafe conditions over there."

g.  And: "If you chose to ignore it, and someone decides to take you to federal court, it is my belief that you're going to be in big trouble."

40.  Hompe's written report, titled "Walworth County Jail Operational Assessment," dated June 21, 2017, is 25 pages long, not counting appendices. Within the first five pages, he states:

a.  Walworth County's new Sheriff, Joshua Boll, contacted the National Institute of Corrections "to seek technical assistance to conduct an operational assessment" of the jail.  Walworth County Jail Operational Assessment, page 3.

b.  The jail is "aging and outdated." *Id.*

12

c.      The jail "houses inmates from many surrounding counties that do not have jails and has become a major component of the overall criminal justice system in th[is] region of the state." *Id.*

d.      The jail "lacks your typical entry and lobby to ensure an appropriate identification and security checkpoint before entering the jail." *Id.* at 4.

e.      Fire exits are "blocked or not fully functional." *Id.*

f.      The jail "lacks sufficient administrative or office space," which "takes away opportunities for supervision and operations enhancement." *Id.*

g.      The booking area is "very small and confined" and does not meet the needs of the booking process. *Id.*

h.      The booking area "lacks any cell to secure inmates in, lacks appropriate area for strip searches and change over, lacks space for medical screening or showering, lacks any bathroom facilities and lacks space for necessary booking equipment, officer workspace and files. Further complicating this area, the visitor side of the inmate visitation is located adjacent to

13

booking with no way to separate the two activates [sic]. This dictates that visitation must be terminated when the booking area is being used for the booking process due to security and safety issues as well as privacy issues during the medical and mental health screening." *Id.* at 5-6.

i. "Once inmates are booked into the facility, they are escorted to a cell adjacent to central control where they are strip searched and changed over into jail issued clothing. This cell contains a camera due to the fact that the cell is also used for housing high risk inmates such as those that are disruptive, intoxicated, and suicidal. Requiring inmates to strip in front of a camera that is recorded and visible to staff is not only not consistent with today's correctional practices but it is contrary to the Prison Rape Elimination Act requirements." *Id.* at 6.[2]

---

[2]Hompe could also have explained that this practice, because it unnecessarily exposes naked prisoners to people of the opposite sex, has been unconstitutional in the Eighth Circuit since 2001. *See Riis v. Shaver*, Civ. 17-3017, D.S.D., Central Div., Doc. 156 (April 28, 2020).

j.      "The control center is not a secure post as the door cannot be secured.  This area is also small and does not contain [the] space needed.  The post is also not consistently staffed due to lack of staffing. . . .  The control center houses the jail computer and keys."  Operational Assessment at 6.

k.      "Two of the [five] housing units are located on the second level which is an area that was converted from Sheriff's residence to inmate housing.  This area contains numerous safety and security concerns due to the lack of detention grade surrounds and furnishings along with the narrow and steep stairs leading to the area.  Household grade showers and plumbing were present along with non-detention glass windows.  Several of the units contain household flooring that poses a fire safety risk."  *Id.*

l.      "None of the units contain any exercise or program space.  The number of bunks in each or [sic] the areas exceeds the seating available."  *Id.*

m.    "The high-risk cells present at the jail do not have intercoms in
them.  This is a correctional standard so that inmates can reach
staff in the event of an emergency.  It appears that the intercoms
were once present but were damaged and removed rather than
replaced." *Id.*

n.    "The jail lacks any space for healthcare and currently does not
provide any onsite medical services from qualified health
professionals.  This is not consistent with today's correctional
practices." *Id.* at 8.

41.    The next ten pages of the report—not described in full here—detail
inadequacies with food service, the laundry and property system, program areas
and visitation, staffing and training, supervision of inmates, ineffective
management of inmate behavior, failure to assess inmate risks and needs including
mental health and medical issues, failure to use an objective inmate classification
system that separates inmates by risk and which "creates significant liability for the
county," inappropriate housing of inmates, failure to meet "inmates' basic needs,"
failure to "defin[e] and convey[]" expectations to inmates, which is "[a] key
component of effective inmate behavior management," failure to "interact with the

population to proactively identify and present issues," failure to provide

"productive activities" for inmates, and failure to adopt and review policies and

procedures. *Id.* at 8-17.

42.    The report then assesses "life, health, and safety-related issues.

Problems or shortcomings in these areas may result in illness or injury to inmates,

staff, or others who are associated with the facility.  The connection between some

of these types of conditions and illness/injury is obvious"; these conditions include

dangers from "unsanitary facilities," "[t]he presences of pests or vermin,"

"[i]nadequate or contaminated ventilation," "mold," and "[e]xcessive amounts of

combustible materials in cells [which] creates a potential fire hazard." *Id.* at 18.

43.    The report finds that "A fire and safety inspection process is not

present at the jail.  This is a necessary component of the overall jail operations and

is critical to life safety." *Id.* at 19.

44.    Finally, the report addresses inadequate sanitation practices, that the

jail "lacks the ability to meet ADA requirements in many areas," that "[t]he

healthcare program is not consistent with today[']s expected correctional practices,"

that "cells used for housing those inmates on suicide watch do not have an

intercom and are not fully suicide resistant," the need to train staff in

"confrontation avoidance techniques" and "de-escalation techniques," and the need for "ongoing monitoring of [staff] performance couple with aggressive problem solving." *Id.* at 20-22.

45.    On October 17, 2017, the commissioners heard from Mike Kelly, a former guard for the St. Cloud, Minnesota penitentiary, who "was asked to tour the jail and present his thoughts." Mr. Kelly told the commissioners that "In his opinion, there were a lot of corners, there shouldn't be stairs leading up to the juvenile holding cells, and overall it is an unsafe environment."

46.    On November 7, 2017, the commissioners heard again from Brad Hompe, who "was present via conference call to answer questions and inform the Commissioners what steps they need to take in order to move forward with the construction of a new jail facility."

47.    Hompe "reiterated that the current facility does not meet our needs and that, in his opinion, renovation of the existing structure is not feasible. Hompe believes we have only two options—to build a new facility or to close the current jail and no longer provide inmate detention in Walworth County."

48.    Despite everything above, in December 2017 and January 2018 the commissioners approved *seventeen* two-year contracts with South Dakota counties

to house their prisoners for $95 per day. Defendants continue to house prisoners from other counties pursuant to similar contracts.

49.     On July 12, 2018, Hompe wrote to the commissioners, stating: "there are existing life safety issues that you are aware of and in my opinion, further delay places an overwhelming amount of liability on the County and on the Commission members personally. It is my opinion that further delays in addressing the issues will place you in a position of being deliberately indifferent if you are not already." Hompe at 0760 (a document disclosed in a personal injury lawsuit).

50.     On June 19, 2018, Hompe spoke at a meeting in the Walworth County courtroom. The commissioners were present, as was the public. The meeting is available at https://www.youtube.com/watch?v=eUhgZ5LQIZI (last visited August 27, 2020). At approximately 1:14:57 of the video, he states:

   a.    "Your old jail . . . simply does not meet federal law, national correctional standards that are accepted in the community anymore."

   b.    "I think the bigger issue is that you have overwhelming life safety issues there not only for the inmates but for your staff and the community."

19

c.    "The bottom line is that the facility no longer meets the needs and is, in my mind, as a person in this business for 25 years, it should no longer be used."

d.    "The bottom line is that it does not meet standards, it can't meet federal law, you're not meeting it today with the processes that you have there in the facilities. And the overwhelming liability is the biggest problem because it's not a matter of if, it's when you are going to have a lawsuit because of what you have and not doing anything about it and it won't be a couple hundred thousand or even a couple million, it will be millions. You will pay for the new facility one way or the other. I believe you're there right now, as far as being deliberately indifferent if you don't do something you know about the issues today and specifically commission members they don't make a decision to do something they're deliberately indifferent meaning they ignore the issue. In federal court you'll be found guilty of that and you will pay dearly."

51.     On July 17, 2018, the Commissioners passed Walworth County Resolution 2018-09 officially recognizing that "the need for a new county jail has arisen in Walworth County, South Dakota."

52.     The Resolution placed on the November ballot a proposed $10.5 bond issue to build a new jail.

53.     On September 17, 2018, during a discussion of plans about what to do if the bond issue did not pass, Commissioner James Houck "stated there is no other option and building is the only option."

54.     At the Walworth County Commission meeting on August 21, 2018, the commission members and Walworth County State's Attorney James I. Hare discussed the jail.    The meeting is available at https://www.youtube.com/watch?v=kXXylDRIUTc (last visited August 27, 2020). The commission members and State's Attorney Hare's discussion includes the following:

> a.     State's Attorney Hare: "If we keep this [jail] open already after the reports is there's two possibilities.  Worst case scenario is our insurance carrier does not carry that insurance because of the risks.  The other thing is, is the risk of lawsuits if we remain open after this vote [illegible]."

b.      State's Attorney Hare: "If you still operate, if it goes down, and you continue to operate, it after, I mean even now, we have exposure, but if it goes down after that election, and you operate it, there's going to be a lot of exposure on this county."

c.      The commission members discuss the possibility of having their insurer come look at the jail.  State's Attorney Hare advises them—not once but twice—"You don't want that."

d.      State's Attorney Hare advises the commissioners: "Plus there's also the ability of you commissioners being personally liable for it for knowledge of problems in that jail that was in that report and something happens, because of it, you can all be held personally liable.  Just FYI."

e.      State's Attorney Hare adds: "That's the problem with that report, it points out the problems which now you're aware of. I'm saying if we don't cure we're going to be on the hook and you can personally be on the hook for failure to act within a reasonable manner."

f.    Then State's Attorney Hare says: "Honestly, you're all on the hook right now."  He tells the commissioners: "My position is, if I were the attorney, you guys would all be sued right now if something happened since it's been disclosed in that report you're all going to be on the hook.  For being sued."  He advises: "I'm just telling you, you have a ton of liability right now."

55.    Before the election, the Walworth County Jail Committee, which consisted of County Commissioners Jim Houck and Kevin Holgard and Walworth County Sheriff Josh Boll, drafted and circulated a brochure with a question-and-answer form, in which they state:

a.    "Why do we need a new jail?"  They answer, in part: "The current jail has served this county for well over 100 years, but is no longer a safe option for the community, staff or inmates. Unless replaced, there is an overwhelming amount of liability that may cost the county taxpayers millions of dollars due to potential lawsuits."

b.    "What is wrong with the current jail that we cannot renovate it?"  They answer, in part: "The current Walworth County Jail

23

has numerous deficiencies.  Not only is the design outdated and unsafe, the facility has only 2 population cells making safety and separation goals impossible to achieve.  The facility cannot meet Federal laws or current accepted correctional practices."

c.    "How will the new jail benefit the citizens of Walworth County?"  They answer, in part, that the county will "be afforded some protection from federal lawsuits by providing the ability to meet the laws and accepted correctional practices."

d.    "How will we pay for the new jail?"  They answer, in part: "The county will be able to pay for the jail construction and a significant portion of the annual operating budget with revenue generated from renting jail beds to other jurisdictions."

56.    Hompe prepared a power point presentation about the problems with the jail.  His slides state:

a.    "The existing jail constructed in 1909 is not safe for the staff, community or inmates."

24

b.    "The jail does not meet Federal law," specifically citing the Prison Rape Elimination Act and the Civil Rights for Institutionalized Persons Act.

c.    "The jail does not meet Nationally accepted jail standards or practices," specifically citing the American Correctional Association, the National Commission on Correctional Health Care, and "Inmate Classification."

d.    "Continue As Is" he describes as "NOT AN OPTION!" (capitals in original).  He provides four reasons:

- "Not Safe: Community, staff, and inmate safety issues"

- "Deliberate Indifference"

- "Extreme Liability for county"

- "Litigation costs, settlements and awards could be millions.  Insurance will not cover."

57.    The proposed bond issue was defeated.

58.    Walworth County continues to use its 1909 jail, which it operates in substantially the same dangerous, deficient, and deteriorated condition described above.

25

59.     Conditions at the jail led to three recent federal civil rights lawsuits against the jail: *Blazer v. Gall,* Civ. 16-1046, which has been settled; *Brandner v. Walworth County,* Civ. 18-1005, which has been settled; and *Maxfield v. Larson,* Civ. 18-1006, which is pending.

60.     Defendants have housed juveniles at the jail in the past, including in the fall of 2019, or later, and unless restrained will continue to do so.

## First Cause of Action

61.     Defendants violate the Fourteenth Amendment right to due process of law of the class of people held in the Walworth County Jail—or who will be held there before this lawsuit is concluded, including juveniles—for any reason other than having been convicted of a criminal offense.

## Prison Litigation Reform Act

62.     The Walworth County Jail does not have "administrative remedies" that are "available" within the meaning of the 42 U.S.C. § 1997e(a).

    a.     Upon entry into the jail, inmates are not advised of any administrative remedy process.

26

b.    Any arguable "administrative remedies" "operate[] as a simple

dead end" within the meaning of *Ross v. Blake*, 136 S. Ct. 1850,

1859 (2016).

c.    Any arguable "administrative remedies" provide no "redress

for a wrong." *Id.*

d.    Any arguable "administrative remedies" are "so opaque that

[they] become[], practically speaking, incapable of use." *Id.*

e.    Jail administrators thwart inmates from taking advantage of any

arguable grievance process "through machination,

misrepresentation, or intimidation." *Id.* at 1860.

f.    The jail specifically instructs its employees that an inmate will

not be given a complaint form the first time a complaint is made

("you would have to get the same complaint more than once to

use a complaint form") (Walworth County Jail Polices [sic] and

Procedures Code of Ethics, page 10-11, ¶ 29, Brad Hompe file at

1703-04), but no inmate is told this.

g.    Inmates who have requested grievance forms—such as Robert Blazer, the plaintiff in *Blazer v. Gall*, Civ. 16-1046—have been refused grievance forms.

h.    Inmates who have repeatedly requested grievance forms—such as Vaughn Maxfield, the plaintiff in *Maxfield v. Larson*, Civ. 18-1006—have been repeatedly refused grievance forms, until finally given several.

i.    Any grievance forms that the jail takes from a prisoner, such as the jail eventually took from Vaughn Maxfield, if they are retained, are merely filed with no action being taken on them.

j.    The jail uses complaint forms to pacify inmates ("The [complaint] form is a good tool to calm someone down.") (Walworth County Jail Polices [sic] and Procedures Code of Ethics, page 11, ¶ 29, Brad Hompe file at 1704).

k.    The jail does not even purport to have a process for resolving grievances, or for responding to a grievance.

l.    The jail does not respond to grievances, does not resolve them, and does not attempt to resolve them.

**Wherefore plaintiffs demand judgment of defendants as follows:**

1.     For certification a class pursuant to F.R.Civ.P. 23(a), (b)(1), and (b)(2);

2.     For permanent declaratory and injunctive relief sufficient to remedy the unconstitutional conditions under which the class is confined, and under which members of the class will be confined in the future; plaintiffs acknowledge that in accordance with *Lewis v. Casey*, 518 U.S. 343, 362 (1996), defendants are entitled to the first (but only the first) opportunity to correct their unconstitutional conduct;

3.     For reasonable attorneys' fees and costs; and

4.     For such other and further relief as the Court deems just.

Dated: September 6, 2020     James D. Leach
Attorney at Law
1617 Sheridan Lake Rd.
Rapid City, SD 57702
Tel: (605) 341-4400
jim@southdakotajustice.com

Stephanie E. Pochop
Johnson Pochop & Bartling Law Office, LLP
P.O. Box 149
Gregory, SD 57533
Tel: (605) 269-0665
Stephanie@rosebudlaw.com

Attorneys for Plaintiffs

By: _James D. Leach_
James D. Leach

29

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Megan Maria Agard, Chico Baker, Robert DeSersa, Kara Jane Logg, Deborah Looking Back, Prairie Rose White Buffalo, and Phillip Louis Young Hawk, as named plaintiffs on behalf of a class, | Walworth County, South Dakota, and Walworth County Commissioners James Houck, Kevin Holgard, Scott Schilling, Marion Schlomer, and Davis Martin, all sued in their official and indiv. capaciti |

**(b)** County of Residence of First Listed Plaintiff  Walworth

*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant

*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
James D. Leach/Attorney at Law/1617 Sheridan Lake Rd/Rapid City, SD 57702/605 341 4400/and/Stephanie E. Pochop/Johnson Pochop & Bartling Law Office, LLP/PO Box 149/Gregory, SD 57533/605 269 0665

Attorneys *(If Known)*
Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | Exchange |
| | Medical Malpractice | | Leave Act | | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 1983

Brief description of cause:
Plaintiffs allege that defendants operate the Walworth County Jail in violation of plaintiffs' constitutional rights

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $  Relief
Injunctive + Declaratory

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes    ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE
09/06/2020

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____